IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>vs.<br><br>FELIX C. UZOECHI,<br><br>            Defendant. | 4:14-CR-3106<br><br>TENTATIVE FINDINGS |

      The Court has received the revised presentence investigation report (PSR) in this case. Defendant Felix C. Uzoechi has filed an objection and moved for a downward departure or variance. Filing 31.

      IT IS ORDERED:

1.   The Court will consult and follow the Federal Sentencing Guidelines to the extent permitted and required by *United States v. Booker*, 543 U.S. 220 (2005), and subsequent cases. In this regard, the Court gives notice that, unless otherwise ordered, it will:

    (a)   give the advisory Guidelines respectful consideration within the context of each individual case and will filter the Guidelines' advice through the 18 U.S.C. § 3553(a) factors, but will not afford the Guidelines any particular or "substantial" weight;

    (b)   resolve all factual disputes relevant to sentencing by the greater weight of the evidence and without the aid of a jury;

    (c)   impose upon the United States the burden of proof on all Guidelines enhancements;

    (d)   impose upon the defendant the burden of proof on all Guidelines mitigators;

    (e)   depart from the advisory Guidelines, if appropriate, using pre-*Booker* departure theory; and

(f)   in cases where a departure using pre-*Booker* departure theory is not warranted, deviate or vary from the Guidelines when there is a principled reason justifying a sentence different than that called for by application of the advisory Guidelines, again without affording the Guidelines any particular or "substantial" weight.

2.  Uzoechi has objected to the loss and restitution calculations set forth in the PSR, and requested a downward departure or variance. Filing 31. The Court's tentative finding is that while the loss calculation contained in the PSR and sought by the government is correct, restitution in this case is much more limited. The Court further tentatively finds that Uzoechi's motion for departure is without merit. His motion for a variance will be resolved at sentencing.

## A. The Loss Calculation

Uzoechi has pleaded guilty to one count of food stamp fraud, in violation of 7 U.S.C. § 2024(b). Uzoechi ran a small grocery store in Omaha, Nebraska, and participated in the Supplemental Nutrition Assistance Program (SNAP) administered by the United States Department of Agriculture (USDA). Under this program, authorized stores may accept food stamp benefits (in the form of a debit card) instead of cash. *See United States v. Ali*, 619 F.3d 713, 716 (7th Cir. 2010). The store's owner can then redeem those benefits with the government at their face value. *Id.* The SNAP program only allows the use of benefits to purchase certain food items; benefits may not be exchanged for non-food items or cash. PSR at ¶ 12.

The government contends that Uzoechi has, for several years, been operating a scheme whereby he has been exchanging SNAP benefits for cash. Uzoechi would pocket some amount of the cash for himself and turn the remainder over to the customer.[1] Uzoechi would then redeem the entire amount of benefits from the USDA for their face value. PSR at ¶¶ 14–18; filing 31 at 3; filings 33 and 34. In April 2014, an undercover USDA agent went to Uzoechi's grocery and used a SNAP benefit card to purchase a few non-food items and to obtain $300 in cash. The same agent returned again in June and July 2014 and used a

---

[1] While Uzoechi claims he only took a small percentage for himself, he cites as an example the purchase by the undercover agent, in which he pocketed 20 to 25 percent of the cash. Filing 31 at 3.

SNAP card to obtain another $350 in cash. PSR at ¶ 13. In September 2014, Uzoechi was indicted on three counts of food stamp fraud, based on the three undercover purchases. Filing 1. After being arraigned, Uzoechi was placed on pretrial release and resumed running his store. PSR at ¶¶ 2, 14.

The applicable Guidelines provide for a base offense level of 6, with graduated increases based on the amount of loss caused by the defendant. U.S.S.G. § 2B1.1. The PSR asserts that Uzoechi is responsible for $546,288 in losses incurred by the USDA. PSR at ¶¶ 14–18, 25. For offenses causing more than $400,000 but less than $1,000,000 in losses, the Guidelines call for a 14-level increase. U.S.S.G. § 2B1.1(b)(1)(H). Thus, the PSR calculates Uzoechi's adjusted level as 20. After deducting 3 levels for acceptance of responsibility, and considering his criminal history score of zero, the PSR calculates Uzoechi's advisory Guidelines sentencing range to be 24 to 30 months' imprisonment. PSR at ¶¶ 36, 59. Uzoechi objects to these loss calculations, and asserts that he is responsible for less than $5,000 in loss, which would result in a total offense level of 3 and a Guidelines range of 0 to 6 months. U.S.S.G. § 2B1.1(b)(1)(A).

The government has submitted two affidavits in support of its $546,288 loss calculation. Both affiants are also anticipated to testify at the sentencing hearing. The first affidavit is from Jolene Stavropoulos-Kuhn, a Section Chief with the USDA who is responsible for detecting and investigating food stamp fraud. Filing 33 at ¶¶ 1–3. The USDA maintains a database tracking each participating store's SNAP on a monthly basis. PSR at ¶ 14. For the tax year of 2007, Uzoechi reported total annual retail sales of $231,000, with total SNAP-eligible food sales of $219,450. By dividing the latter figure by 12, Stavropoulos-Kuhn estimated that Uzoechi's legitimate, SNAP-eligible food sales were approximately $18,287.50 a month. Filing 33 at ¶ 5 & p. 3. Yet for the period from January 2010 through September 2014 (the month he was indicted), the USDA's records show that Uzoechi was redeeming far greater amounts of benefits, averaging $70,756 a month.[2] Filing 33 at 5–7. By comparison, in the 3 months following the indictment (October through December 2014), Uzoechi's average monthly redemptions fell to $21,427, a figure much closer to his reported redemptions from 2007. Filing 33 at 2–3.

---

[2] This average is based on the Court's calculations using the USDA's records.

Although the government contends that Uzoechi has been defrauding the USDA since January 2010, it has limited itself to claiming losses arising during the 12-month period from August 2014 (the month prior to the indictment) to September 2013. And during that period, Uzoechi's redemptions averaged $66,951 a month. Filing 33 at 1–4. As noted above, by comparison, the average monthly redemptions in the 3 months following the indictment were $21,427. Stavropoulos-Kuhn used the difference between these two averages to arrive at an estimate of the average monthly amount of illegitimate redemptions: $45,524.[3] Multiplying that by 12 months yields the government's total claimed loss of $546,288. Filing 33 at 1–4. PSR at ¶¶ 14–18.

The government has also submitted an affidavit from Martin Dahlke, a Special Agent for the Office of Inspector General for the USDA, who served as chief investigator in this case. Filing 34. Dahlke avers that he has reviewed bank records for Uzoechi's grocery store for the period from October 1, 2011 through May 31, 2012. These records reflect checks written and debit card purchases in excess of $300. Dahlke examined the records to identify all expenditures by Uzoechi or his store for SNAP-eligible food items. When an expenditure could have been either a food or non-food item (for example, a purchase from Sam's Club), Dahlke gave Uzoechi the benefit of the doubt and classified it as a food purchase. Filing 34 at 1. Dahlke calculated that during this 8-month period, Uzoechi spent $43,839.67 on food purchases. During this same period, Uzoechi claimed redemptions totaling $527,222. Dahlke concludes that this discrepancy reveals that a large number of SNAP transactions were for non-food items, such as cash. Filing 34 at 2.

Uzoechi counters that the reason his sales, and thus redemptions, were down for the months following the indictment is that rumors were circulating that he was in jail and that his store was closed. And he maintains that some of his customers were scared to return for fear that they would lose their SNAP benefits. Filing 31 at 2. Uzoechi has submitted affidavits from several customers to this effect, filing 32, and plans to present their testimony at sentencing.

---

[3] The fact that Stavropoulos-Kuhn used this figure—$21,427—rather than the lower average legitimate monthly benefits Uzoechi reported in 2007 works in Uzoechi's favor.

As this dispute requires the Court to hear testimony and weigh credibility, it must be resolved at the sentencing hearing. However, the Court makes the following tentative observations in order to alert the parties to its view of the law and the facts in this case.

The Court is obliged to make its own determination as to the amount of loss. *See United States v. Cain,* 134 F.3d 1345, 1348 (8th Cir. 1998). In cases of food stamp fraud, the amount of loss is not the amount personally gained by the defendant. Rather, the proper calculation is to take the total food stamp redemptions (both fraudulent and legitimate redemptions) and subtract from that the legitimate food stamp sales, in order to determine the total illegitimate redemptions. *Ali,* 619 F.3d at 721. Ultimately, this Court needs to make a "'reasonable estimate of the loss.'" *United States v. Rice,* 699 F.3d 1043, 1049 (8th Cir. 2012) (quoting U.S.S.G. § 2B1.1 cmt. n.3(C)).

The Court's tentative finding is that Uzoechi's explanation lacks merit and that the government's loss calculation is more or less correct. Uzoechi's explanation fails to account for the large discrepancy between food purchases and SNAP sales detected by Dahlke—that is, unless Uzoechi was charging what the Court computes to be a 1,200 percent markup. It also fails to account for the large discrepancy between Uzoechi's self-reported eligible sales from 2007 and his redemptions for the period from January 2010 through August 2014.

The government arrived at its loss calculation by computing a reasonable estimate of the difference between Uzoechi's legitimate redemptions and the inflated, fraudulent redemptions he submitted. *See Ali,* 619 F.3d at 721. If anything, the government's calculation is low. The government contends that the illegitimate redemptions averaged $45,524 a month. But the evidence would support a higher figure. For example, the evidence from Dahlke shows that in the 8 months from October 2011 to May 2012, there was a $483,382.33 disparity between food purchased and redemptions claimed. That results in a monthly average of $60,423 in illegitimate redemptions. These figures, admittedly, do not account for the legitimate profit Uzoechi would have made by charging some amount of mark-up on his goods. *See Ali,* 619 F.3d at 721. But even if the Court factors in a 100 percent markup,[4] the resulting monthly average of illegitimate

---

[4] The Seventh Circuit found a 50 percent markup to be a reasonable estimation in *Ali*, which involved a small grocery store in Chicago. *Ali,* 619 F.3d at 716–17, 721. Common

- 5 -

redemptions works out to be $54,943.[5] Multiplying that by 12 months results in a total loss of $659,314, an amount over $100,000 more than the government seeks.

Moreover, the government has chosen not to claim losses for the entire period of inflated redemptions. If the 56 months for which data is available, from January 2010 through August 2014 are included, then even using the government's lower monthly average of $45,524, the total loss would be $2,549,344.00. This would increase Uzoechi's adjusted offense level by an additional 4 levels. U.S.S.G. § 2B1.1(b)(1)(J). Thus, even if Uzoechi can point to some other factors that might reduce the total amount of illegitimate redemptions, the government's claimed loss of $546,288 appears to be a reasonable estimate that is supported by a preponderance of the credible evidence.

### B. Restitution

Loss calculation for purposes of restitution is not the same as loss calculation under the Guidelines. The Guidelines calculation considers not only the conduct underlying the offense of conviction, but also any losses falling under the broader concept of relevant conduct. *See United States v. Quevedo*, 654 F.3d 819 (8th Cir. 2011). However, as the Court explains next, restitution in this case is limited to the much narrower category of losses caused by the offense of conviction: the $402.50 contained in count 1 of the indictment.[6]

The Court can only order restitution when explicitly empowered to do so by statute. *United States v. Doering*, 759 F.3d 862, 866 (8th Cir. 2014). In this case, the Court's authorization comes from the Victim and Witness Protection Act ("VWPA"), 18 U.S.C. § 3663, which allows the Court to award restitution in any criminal case "to the extent agreed to by the parties in a plea agreement." 18 U.S.C. § 3663(a)(3). Subject to two exceptions, restitution orders under the VWPA are

---

sense suggests that a higher mark-up would prevail in a larger city such as Chicago, but the Court has given Uzoechi the further benefit of the doubt and doubled the mark-up.

[5] Total food purchases of $43,839.67 multiplied by 2 [to calculate a 100 percent markup] yields $87,679.34 in legitimate food sales. Subtracting this amount from the total redemptions [$527,220.00] yields total illegitimate redemptions of $439,542.66 for the 8 months at issue. Dividing that figure by 8 yields the monthly average of $54,943.

[6] Although Uzoechi has not raised this matter in his objection, the Court has considered it on its own motion, as it goes to the Court's authority to award restitution.

limited to losses caused by the specific conduct that is the basis of the offense of conviction. *Hughey v. United States,* 495 U.S. 411, 416 (1990); *United States v. Chalupnik,* 514 F.3d 748, 752 (8th Cir. 2008). Therefore, restitution may be awarded only to the victims of the offense of conviction, and a victim may not be compensated for conduct unrelated to the offense of conviction, even if that unrelated conduct was the subject of criminal charges dismissed by the government in exchange for the defendant's guilty plea. *Chalupnik,* 514 F.3d at 752. Nor does it matter that conduct falling outside the offense of conviction might be considered "relevant conduct" under the Guidelines; that inquiry is broader than, and distinct from whether restitution may be ordered. See *United States v. Locke,* 643 F.3d 235, 247 n.7 (7th Cir. 2011).

This limitation arises from the Supreme Court's decision in *Hughey*. In response, Congress added a definition of "victim" to the VWPA that "retained the core limiting principle of *Hughey* but clarified its application to certain offenses and to plea agreements." *Chalupnik,* 514 F.3d at 752. That amended portion of the VWPA provides:

> (2) For the purposes of this section, the term "victim" means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. . . .[7]
>
> (3) The court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement.

18 U.S.C. § 3663(a)(2)–(3).

---

[7] Although the statute speaks of "persons," it is well settled that government entities and agencies, such as the IRS, may be considered victims for purposes of the VWPA. *United States v. Senty-Haugen,* 449 F.3d 862, 865 (8th Cir. 2006); *see also United States v. Oceanpro Indus., Ltd.,* 674 F.3d 323, 331 (4th Cir. 2012).

In sum, restitution orders are limited to (1) losses caused by the specific conduct that is the basis of the offense of conviction; (2) losses caused by conduct committed during an offense that involves as an element a scheme, conspiracy, or pattern; or (3) restitution agreed to in a plea agreement. Only the first category is applicable in this case, and thus the amount of restitution is limited to the $402.50 alleged in the count of conviction.[8]

This case does not involve an offense which has as an element a scheme, conspiracy, or pattern. The Court examines the language of 7 U.S.C. § 2024(b) to determine its elements. *United States v. Reynolds*, 432 F.3d 821, 822–23 (8th Cir. 2005); *see also, United States v. Espinoza*, 677 F.3d 730, 732–733 (5th Cir. 2012); *United States v. Kones*, 77 F.3d 66, 70 (3d Cir. 1996). Section 2024(b)(1) applies to any person who "knowingly uses, transfers, acquires, alters, or possesses benefits in any manner contrary to this chapter or the regulations issued pursuant to this chapter." The statute does not require proof of a scheme, pattern, or conspiracy. Nor does it matter whether Uzoechi's conduct was, in fact, part of a scheme or pattern—the Court must look to the elements of the offense as set forth in the statute. *Reynolds*, 432 F.3d at 823.

That brings the Court to the final basis for awarding restitution: the parties' plea agreement. Uzoechi's plea agreement provided that "[t]he Defendant acknowledges restitution will be ordered as a part of the sentence in this case, and the Defendant agrees the Court may order restitution to <u>all victims</u>, not just those pertaining to the count of conviction." Filing 22 at 3 (emphasis supplied).

The Court does not read this clause to authorize any additional restitution in this case. By its terms, the clause focuses on authorizing

---

[8] The Court is separately authorized to award restitution as a condition of probation or supervised release, even for offenses not enumerated in the VWPA. 18 U.S.C. §§ 3556, 3563(b)(2), 3583(d); *United States v. Perry*, 714 F.3d 570, 577 (8th Cir. 2013). However, such restitution is otherwise governed by the same procedures and principles as an award authorized by the VWPA. *See* 18 U.S.C. § 3556. Most importantly, restitution as a condition of probation or supervised release is also limited to losses caused by the offense of conviction, subject to the same two exceptions discussed above. *See, United States v. Freeman*, 741 F.3d 426, 433–35 (4th Cir. 2014); *United States v. Batson*, 608 F.3d 630, 636–37 (9th Cir. 2010); *United States v. Varrone*, 554 F.3d 327, 334 (2d Cir. 2009); *United States v. Frith*, 461 F.3d 914, 919–20 (7th Cir. 2006).

restitution to *all victims*, not for all losses caused by the defendant. This language is, in fact, a portion of boilerplate found in many plea agreements used in this district. And in a case with multiple victims, this clause makes sense. But in this case, the only victim is the USDA, and the clause is simply inapplicable. If the parties had desired to authorize an award of restitution to the USDA that was not limited to the conduct underlying the offense of conviction, they could have so provided. But lacking an explicit agreement to that effect, the Court is without authority to order any additional restitution.[9] *See United States v. Davis*, 714 F.3d 809, 815 (4th Cir. 2013). Accordingly, the Court's tentative finding is that any award of restitution in this case must be limited to the losses caused by the offense of conviction: $402.50.

### C. Motion for Departure or Variance

Finally, Uzoechi has moved for a variance or departure under U.S.S.G. § 5K2.0(a)(3). That section provides that downward departure may be warranted in "exceptional" cases, if the Court determines that certain circumstances are not adequately taken into consideration by the Guidelines. U.S.S.G. § 5K2.0(a)(3). Uzoechi argues that such a departure is warranted due to the allegedly small amount he personally profited from his scheme to defraud the government. The Court tentatively finds the request to lack merit. The applicable Guideline, § 2B1.1(b), does not fail to take this circumstance into account—quite the opposite. That guideline explicitly provides that loss, and thus culpability, is assessed by considering the loss to the victim, not the gain by the defendant. *See* U.S.S.G. § 2B1.1 cmt. nn.3(A), (B); *see also* cmt. n.(3)(F)(ii). Thus, the Court tentatively finds Uzoechi's request for a departure to be without merit. Uzoechi's request for a variance, to the extent it rests on the same grounds, fares no better. That said, the Court will consider the entirety of the 18 U.S.C. § 3553(a) factors, and will resolve Uzoechi's request for a variance at sentencing.

3. Except to the extent, if any, that the Court has sustained an objection, granted a motion, or reserved an issue for later resolution in the preceding paragraphs, the parties are notified that the Court's

---

[9] The government was on notice of the limitations of this language in the plea agreement, as the Court has previously construed an identically-drafted plea agreement in the same way. *See United States v. Clabaugh*, case no. 4:12-cr-3046, filing 44 at 5–6 (July 19, 2013).

tentative findings are that the presentence report is correct in all respects.

4. If any party wishes to challenge these tentative findings, that party shall, as soon as possible (but in any event no later than three (3) business days before sentencing) file with the Court and serve upon opposing counsel an objection challenging these tentative findings, supported by a brief as to the law and such evidentiary materials as are required, giving due regard to the local rules of practice governing the submission of evidentiary materials. If an evidentiary hearing is requested, such filings should include a statement describing why a hearing is necessary and how long such a hearing would take.

5. Absent timely submission of the information required by the preceding paragraph, the Court's tentative findings may become final and the presentence report may be relied upon by the Court without more.

6. Unless otherwise ordered, any objection challenging these tentative findings shall be resolved at sentencing.

Dated this 16th day of March, 2015.

BY THE COURT:

_____
John M. Gerrard
United States District Judge